UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Case No. 19-CR-081-WES |
| MICHAEL CHAVES, | |
| Defendant. | |

## UNITED STATES' SENTENCING MEMORANDUM

### I.   INTRODUCTION

The defendant is scheduled to be sentenced by this Court on Wednesday March 10, 2021. The defendant stands convicted of ten charges: five counts of bank fraud, 18 U.S.C. § 1344, two counts of wire fraud, 18 U.S.C. § 1343, one count of falsification of records, 18 U.S.C. § 1519, one count of aggravated identity theft, 18 U.S.C. § 1028A, and tax evasion, 26 U.S.C. § 7201. As the Presentence Report (PSR) recounts, his criminal conduct continued after his plea of guilty on August 22, 2019 up until June 2020 when he was arrested for perpetrating a return scheme involving Amazon. The PSR calculates an offense level of 21, a criminal history category of III, yielding a Guideline Range of 46-57 months plus 24-months consecutive on the aggravated identity theft charge.

Despite his criminal history, conviction on multiple felony counts, and the commission of additional crimes while on supervised release, remarkably the defendant urges the Court to sentence him to time served.  Although he has accepted responsibility for his crimes, his sentencing memorandum is full of irrelevant explanations, excuses, and deflection regarding his criminal conduct.  He also devotes significant effort to explaining away his conduct underlying

his aggravated identity theft conviction – an effort that encapsulates the manner in which he conducted his business and belies a misunderstanding of the law surrounding 18 U.S.C. § 1028A.

That said, as the United States has acknowledged, for reasons related to the defendant's cooperation in another matter, he is deserving of consideration for that cooperation and the United States has moved the Court asking for a 5-level reduction in the defendant's offense level on the fraud and tax charges. If the Court grants the United States' motion, that will yield an offense level of 16. With the defendant's criminal history category III, he would have a Guideline level of 27-33 months. For the reasons articulated below, the United States asks the Court to impose a sentence at the high end of the Guideline Range or 33 months in addition to the 24 months consecutive on the 18 U.S.C. § 1028A charge.

## II.   FACTUAL BACKGROUND

The defendant was the president, sole shareholder and officer of CAT Inc., an auto carrier business in East Providence. His clients consisted of auto dealerships and snowbirds who needed their cars transported. As an interstate auto hauler, the defendant and CAT operated under the jurisdiction of the United States Department of Transportation, Federal Motor Carrier Safety Administration (FMCSA) which is charged with regulating the safety of the trucking and motor carrier industry nationwide. The primary mission of the FMCSA is to prevent fatalities and injuries relating to motor vehicle operations.

On March 8, 2016, FMCSA conducted a safety audit of CAT. The auditor found a number of violations, including but not limited to the following: (1) CAT did not have completed drivers' employment applications for its drivers; (2) CAT did not maintain drivers' road test certificates; (3) CAT did not maintain its drivers' annual motor vehicle records from each state driver licensing agency; (4) CAT did not maintain annual reviews of its drivers' driving records;

(5) CAT did not maintain medical examiners' certificates for each of its drivers, certifying that they were medically able to drive; (6) CAT did not maintain investigations into drivers' safety performance;  (7) CAT had not implemented an alcohol or controlled substance testing program; (8) CAT allowed drivers' to operate without a current operating license, or without a properly classified license;  (9) CAT allowed drivers to exceed the maximum number of driving hours allowed; (10) CAT did not maintain maintenance files for its vehicles; (11) CAT did not conduct annual inspections of its vehicles; and (12) CAT did not require drivers to complete daily vehicle inspection reports.[1]

As a result of the above, FMCSA concluded that CAT did not have "adequate basic safety management controls in place."  CAT was given 45-days to develop a plan to correct the deficiencies or an out-of-service order would take effect, prohibiting CAT from operating.

On April 27, 2016, via email, CAT submitted various documents demonstrating the steps it had taken to correct the deficiencies noted in the safety audit and in order to avoid the out-of-service order taking effect.  The defendant signed the corrective action plan "Michael Tavares Chaves."  On April 29, 2016, the FMCSA notified CAT that based on its submissions it was accepting the corrective action plan and CAT was allowed to continue operating.

On September 1, 2016, because of its previous findings, the FMCSA conducted a compliance review of CAT.  Notably, the FMCSA had notified the defendant on July 21, 2016, that it wanted to conduct a compliance review but the defendant informed the program specialist conducting the review that he was going to be travelling with his family out of the country until August 4, 2016.  In response to FMCSA's request for documentation to support his claim that he was unavailable, the defendant produced a photo of boarding passes purportedly issued for him.

---

[1] Notably, during the execution of a search warrant in March 2019, the agents found no relevant DOT documents.

As a result, the compliance review was postponed and rescheduled. The review lasted longer than normal for a carrier of CAT's size because of the difficulty the FMCSA had in obtaining the relevant documents from the defendant.  During the course of the current criminal investigation, investigators reviewed law enforcement databases relating to international travel for the defendant's international trips and determined that he did not have one scheduled for the July/August 2016 timeframe.  In fact, defendant admits that the boarding passes he provided the FMCSA specialist in order to postpone the compliance review were fraudulent.

Over the course of the compliance review, the defendant admitted that although he had previously submitted documents disavowing his relationship with various other CAT incarnations, CAT was in fact a continuation of eight other carriers, with different DOT numbers. Indeed, in preparing for the September 2016 compliance review, through the use of the FMCSA computer systems, investigators learned that CAT Inc. was a reincarnated carrier or affiliated with as many as nine other companies previously registered with FMCSA.  The defendant or a known alias of his was associated with all ten companies including CAT Inc.  At the time of the compliance review, three of the nine companies were subject to various out of service orders issued by FMCSA for non-compliance.  The defendant admitted that he had abandoned these other DOT numbers when in previous instances the FMCSA had found him to be operating out of compliance with safety regulations.

Also during the compliance review, the defendant submitted documentation of CAT's participation in a drug and alcohol-testing program.  However, during the review the investigator determined that some of the drug testing documentation produced by the defendant was false. For example, one driver purportedly was undergoing a drug test at the same time he was undergoing a driver/vehicle exam in New Jersey.  Upon being confronted with this discovery, the

defendant admitted that he had falsified the documentation.  The defendant admitted to falsifying driver logs, a medical certificate, and a prior employment verification form.   The compliance review also found violations relating to drivers driving over the allowed hours. The defendant signed a statement admitting the above.  As a result, the FMCSA issued the defendant an "unsatisfactory rating" which is meant to indicate that a carrier does not have adequate safety management controls in place.  The defendant was given 60-days until November 8, 2016, to appeal the rating or correct the deficiencies found, or CAT would be prohibited from operating its commercial carriers in interstate and intrastate commerce.

On September 22, 2016, in order to stay in business, the defendant entered into an agreement with the FMCSA to upgrade CAT's unsatisfactory rating. A schedule attached to the consent agreement detailed the dates on which the defendant and CAT were required to submit certain documentation and reports – the first was January 10, 2017.  The defendant failed to meet the January 10, 2017, deadline. As a result, on January 24, 2017, FMCSA issued a Notice of Failure to Comply with Terms and Conditions of the Agreement and CAT was ordered to cease and desist all operations effective January 30, 2017.

In order to keep operating without FMCSA becoming aware that CAT was operating illegally, the defendant needed access to another DOT number.[2]  At the beginning of 2017, the defendant began paying a person known by the initials RY to use the DOT number for the company VP ran.  The company, VP Transport, incorporated in New York, was owned by

---

[2] Title 49 United States Code, Sections 31131 through 31151 and 31501 to 1504 (the Safety Laws) contain laws relating to the safety of motor carriers. Title 49, United States Code, Section 31144 prohibits an owner or operator of a motor carrier from operating if the Secretary of the DOT, as delegated to the FMCSA, determines the owner or operator is not fit to operate safely. The Motor Carrier Safety Regulations are codified at 49 C.F.R. §§ 350-399 (the Safety Regulations). Knowing and willful violations of any Safety Law or Safety Regulation constitutes a Class A misdemeanor under 49 U.S.C. § 521(b)(6)(A).

another individual, VP who was unaware of the arrangement to which the defendant and RY had agreed.  In order to execute the scheme, the defendant put "VP Transport" cabin decals on his trucks displaying VP's DOT number on them.  In addition to taking over the use of the VP Transport name and DOT number, the defendant also took over the filing of required biannual identification reports with DOT.  These reports are required to be filed twice a year by each motor carrier holding a DOT number. For reasons that remain unclear, the defendant filed the reports more frequently and almost every time did so listing either a different principal or mailing address for VP Transport.   Starting on December 8, 2016, the defendant filed numerous DOT reports under the individual VP's name, at times signing VP's name.  Count 9 charges the defendant with aggravated identity theft based on an April 4, 2017, report the defendant filed using the internet and on which he represented himself to be the individual VP.  He changed the principal address for VP to an address in Seekonk, Massachusetts, that the defendant had listed on other business-related documents over the years.

As a result of the filing of the false biannual reports (as well as other acts) the defendant was pretending to be the individual VP as well as the company VP Transport when he was still Michael Chaves and operating as CAT.  This enabled him to obtain a thing of value to him, i.e. VP's DOT number, which he needed in order to operate his business.  Although he was using VP's DOT number and putting VP cabin decals on his trucks, CAT was still the same business with the same employees, same customers, same trucks, same location, same bank accounts etc. Continuing to operate falsely as VP and VP Transport enabled the defendant to continue to operate without having to address his previous noncompliance with FMCSA safety regulations.

Over the course of the investigation, investigators learned of the defendant's commission of numerous instances of bank and wire fraud.  The  facts underlying the five counts of bank and

two counts of wire fraud are detailed exhaustively in the PSR and the United States will not repeat them herein.  In sum, the Information charged that the defendant obtained $332,000 in loans to which he was not entitled by creating, among other fraudulent paperwork, false tax documentation – which he did not possess because he has not filed a tax return since 2003 – and listing collateral which did not exist.  Count 5 of the Information charged wire fraud based on the defendant's creation of approximately 15 fraudulent checks totaling $64,453, which he fabricated to make it seem as if they had been issued by a client of his, Land Rover of Richmond. He was successful in depositing the checks into his various business accounts and they cleared through Wells Fargo bank before Land Rover of Richmond was able to detect the defendant's passing of the fraudulent checks.

The PSR also includes additional instances of bank fraud totaling $134,500 which were brought to the attention of investigators in the later stages of the investigation or after charges were filed.

Finally, Count 10 of the Information charged defendant with tax evasion for the years 2014 through 2017.  As a result of his failure to file tax returns for those years, the defendant owes the IRS $171,883.33.

## III.   <u>ARGUMENT</u>

Section 3553 requires that in imposing a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, the Court consider the nature and circumstances of the offense and the history and characteristics of the defendant.  18 U.S.C. §§ 3553(a)(1), (2).  In addition, the Court must consider the need for the sentence imposed to promote respect for the law, provide adequate deterrence, and protect the public.  18 U.S.C. §§ 3553(a)(2)(A), (B), (C).

**A.  The Nature and Circumstances of the Offense**

Given the number of offenses of which the defendant stands convicted, the United States addresses each category separately.

**(1) Falsification of Records and Aggravated Identity Theft**

The seriousness of Defendant's conviction under 18 U.S.C. § 1519 cannot be understated. Section 1519 states:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object ***with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States*** or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

18 U.S.C. § 1519 (emphasis added).

The defendant ran an interstate auto hauling business.  As such, he was subject to regulation by the FMCSA.  Yet, he ran his business as if he was not.  In March 2019, search warrants conducted at his home and business uncovered no documentation he was required to keep as an interstate auto-hauler subject to FMCSA regulation.  Over the years, when FMCSA found him to be operating out of compliance with safety regulations, instead of correcting various deficiencies, the defendant would abandon whatever DOT number he was using at the time, incorporate a new business and obtain a new DOT number.  For years, this allowed him to evade FMCSA regulation.

8

In 2016, FMCSA caught up with him and conducted an audit, only to have the defendant obstruct the audit by producing fraudulent documentation regarding driver logs, a medical certificate, and a prior employment verification form.  A subsequent compliance audit discovered his falsification of records as well as violations relating to drivers driving over the allowed hours.  Again, instead of correcting the deficiencies in his record keeping and safety protocols, the defendant went to great lengths to obtain another DOT number – the number associated with the business being run by VP.  This fraud allowed the defendant to continue to operate falsely as VP and VP Transport without having to address his previous noncompliance with FMCSA safety regulations.

In his sentencing memorandum, the defendant incorrectly states that if he had merely asked VP for permission to use his DOT number, he would not have committed aggravated identity theft.  He is incorrect.  Even with VP's permission, the use of VP's DOT number to defraud the FMCSA by allowing the defendant access to a DOT number he could not obtain otherwise would be "unauthorized" under the statute.  An individual cannot give permission for their identity to be used in an unauthorized manner or to commit fraud.  See United States v. Valdes-Ayala, 900 F3. 20, 34-36 (1st Cir. 2018).

The implications to the public of  defendant's noncompliance with FMCSA safety are apparent when one looks at the results of the safety inspections to which defendant's trucks were subjected during the period he was operating as VP Trans.  During that period, he was subject to 44 safety inspections.  Eleven of the 44 inspections resulted in one of the defendant's vehicles being placed out of service for safety violations. Twelve of the 44 inspections ended in one of defendant's drivers being placed out of service for driver violations.

In 2016, the defendant fabricated records indicating that his drivers had been medically cleared for work and that he had conducted the required drug testing of his employees.   He created these documents because he lacked the documentation that his drivers were medically cleared to drive and that they were drug free.  In addition, the review concluded that he had committed safety violations by allowing drivers to exceed the allowed amount of driving hours in a given time frame.  All three of these things have serious safety implications for his drivers and anyone encountering them on the roads.  And yet, instead of correcting the deficiencies, instead of choosing to run his business in a safe manner, the defendant instead chose to skirt the regulations and use VP's DOT number to continue operating his business irresponsibly and outside the purview of FMCSA, potentially putting the public at risk.  He has no explanation for this and his conduct evidences callousness and a complete disregard for anyone but himself and what was most expedient at the time.

### (2) Bank and Wire Fraud

Defendant's conduct underlying the bank and wire fraud charges also evidences the same disregard for the rules that apply to everyone else.  Through the submission of a variety of fraudulent documents, including false tax documents, false motor vehicle purchase contracts, and false Rhode Island Department of Motor Vehicle documents, the defendant obtained $466,500 to which he was not entitled.  The defendant intended his lies to induce the banks to part with funds that they otherwise would not have given him.  Thus, he intended to harm the banks by inducing them to loan him money they otherwise would not have.  For several of the loans, the defendant represented that he was purchasing a car and thus there was collateral for the loan.  In fact, no such car purchase had taken place.  The fact that he made payments on some of the loans does not change the fact that each time he submitted a loan application containing materially false

information, the defendant intended to deceive the banks into giving him money to which he was not entitled.

Notably, in his sentencing memorandum, the defendant says nothing about his conduct underlying Count 5 in the Information.  Count 5 charges bank fraud in connection with a check kiting scheme he perpetrated by creating $64,453 of fraudulent checks and depositing them into his accounts before his actions were detected.  This was outright theft and again evidences the defendant's disregard for the law, that the rules do not apply to him and his sense of entitlement to do and take whatever serves him in the moment.

**(3) Tax Evasion**

The defendant has not filed a tax return since 2003 – presumably because the last time he did the IRS calculated he had a balance due.[3]  In this case, he owes the IRS $171,883.33.

Tax fraud is theft from the pockets of every tax paying United States citizen and resident. The Supreme Court has long recognized that, "the United States has relied for the collection of its income tax largely upon taxpayers' voluntary disclosures rather than upon a system of withholding the tax from those from whom income may be received." Spies v. United States, 317 U.S. 492, 495 (1943).  Indeed, a functioning government relies on its citizens and residents to report timely, completely, and honestly, all taxes they owe, which is why Congress has made it a criminal offense to evade income taxes and fail to file tax returns.  See United States v. Zukerman, 897 F.3d 423, 428 (2d Cir. 2018) ("Tax crimes represent an especially damaging category of criminal offenses, which strike at the foundation of a functioning government.")

---

[3] IRS transcripts indicate the defendant filed tax returns for the tax years 2001 and 2002 and was assessed taxes and penalties in the amount of $10,540.24 and $12,979.30, respectively, for a total of $23,519.54.  In July 2003, he entered into an installment agreement with the IRS.  He made three payments totaling $1,157.00, after which the IRS gave the debt to a third-party collections agency.  Ultimately, due to the defendant's failure to pay, his balance was cleared based on statutory expirations.

(citing district court's opinion) (edits omitted); cf. New York ex rel. Cohn v. Graves, 300 U.S. 308, 313 (1937) ("Enjoyment of the privileges of residence in the state and the attendant right to invoke the protection of its laws are inseparable from responsibility for sharing the costs of government").  Simply stated,  "[t]axes are what we pay for a civilized society . . . ." Compania General de Tabacos de Filipinas v. Collector of Internal Revenue, 275 U.S. 87, 100 (1927) (Holmes, J., dissenting).

The multi-year tax fraud that the defendant perpetrated cost the U.S. Treasury, and this nation's honest taxpayers an unknown amount of money – although charged with only four years of tax evasion, the defendant has not filed a tax return since 2003.  Had his actions not been discovered, his illegal conduct would have continued unabated and cost the American taxpayers even more money.

**(4) Amazon Return Scheme**

The United States filed the Information in the instant case on July 24, 2019.  The defendant made his initial appearance on August 2, 2019 and pleaded guilty on August 22, 2019. At each Court appearance, the defendant was admonished that one of his conditions of pretrial supervision was that he not commit another federal, state or local offense.

Yet he did.  From May 2019 through June 16, 2020, the defendant engaged in a scheme to defraud Amazon.com (Amazon) through fraudulent transactions and theft of inventory via falsely misrepresented returns.  Since March 2017, the defendant held approximately 30 Amazon customer accounts under various names and email addresses.  Over this time period, his accounts placed approximately 10,795 orders totaling approximately $713,970.78, most of which were refunded based on alleged return of the items purchased.  The defendant received a total of approximately $643,324.04 in concessions or refunds on approximately 7,450 orders, including

nearly approximately 7,200 items that were physically returned to Amazon. The parties have stipulated that through the execution of this scheme, the defendant netted $50,000 in fraudulent returns. Examples of this conduct are detailed in the PSR and include him returning wood for a tire, light bulbs for Apple Air Pods and dog treats for an automobile stabilizer kit. Chaves benefitted from the scheme by keeping the new and unused items after Amazon issued a refund. In this manner, Chaves defrauded Amazon of a value of $50,000.

**B.    History and Characteristics of the Defendant**

The defendant's actions in this case and his criminal history evidence an individual who has total disregard for the law, appears unable to tell the truth and whose criminal actions were taken purely out of self-interest. His sentencing memorandum is full of long-winded explanations about his criminal history and his actions in this case. None of what the defendant articulates, however, changes the following:

The defendant stands convicted of ten felony counts. His crimes afforded him approximately $500,000 to which he was not entitled, $64,453 which was outright theft as a result of a check kiting scheme. He ran his business in a reckless manner, with no apparent regard for the safety of the public or his obligations as an interstate auto hauler. Instead of complying with FMCSA safety regulations, every time FMCSA caught up with him, he reincarnated his business to avoid having to comply. In the end, instead of doing the right thing and running his business in accordance with what the law requires, he used the identity of VP to evade FMCSA detection. He is currently unable to obtain a license or register a car in Rhode Island because of his motor vehicle violations. He has approximately 29 law enforcement contacts over the years. Most notable and akin to his current offense is his 2011 obtaining money under false pretense conviction in which he was remote depositing checks multiple times. In

2005 and 2015, he was convicted of receiving stolen goods.  He is a tax cheat, having evading

paying his taxes since 2003.  Finally, if there were any doubts remaining regarding his total

disregard for the law, his criminal conduct throughout his pretrial supervision in the instant case

conclusively demonstrates the kind of person he is.

      **C.**      **The Need to Afford Adequate Deterrence**

One of the paramount factors the Court must consider in imposing sentence under

Section 3553(a) is the need for the sentence to, "afford adequate deterrence to criminal conduct."

18 U.S.C. § 3553(a)(2)(B).  Many of the white collar defendants who appear before this Court

have no prior criminal record.  Most do not continue to engage in criminal conduct after they

stand convicted.  Neither of these statements apply to the defendant.  As discussed, the defendant

has a noteworthy criminal record dating back to 2005.  The defendant also boldly continued one

of his criminal schemes after pleading guilty and while on pretrial supervision.  He has not filed

a tax return since 2003.  The imposition of a sentence of 33 months plus 24 months on the

aggravated identity theft count is essential to deterring the defendant from continuing his life as a

fraudster and a tax cheat and provides a strong incentive to others who contemplate similar

conduct.

      **D.**      **The Need to Avoid Unwarranted Sentence Disparities**

As the Court is well aware, the Sentencing Guidelines were promulgated, in significant

measure, to minimize disparities in federal sentences. Although the Guidelines are no longer

mandatory, the importance of eliminating sentencing disparities remains an important factor

which the Court must separately consider pursuant to 18 U.S.C. § 3553(a)(7).

The defendant has submitted several examples of what he contends are comparable

criminal cases.  The United States had difficulty locating many of the cases the defendant cites

14

because the citations lacked docket numbers and the defendants' first names. Of the ones the United States was able to locate, each case involved a defendant who lacked any criminal history and was a defendant who stood convicted of only one count. Thus, the cases cited do not provide a true point of comparison for this defendant. Indeed, the defendant appears unique as a defendant before this Court in his criminal history and the extent of his conduct.

### E.      Restitution

Based on the Information obtained by the United States Probation Department, the defendant's sentencing exhibits, and information received by investigators from the victims in this case, below are the current mandatory restitution amounts owed:

| | |
|---|---|
| Citizens Bank | $44,994.92 ($38,457.51 principal + $6,537.53 interest) |
| Bridgewater Credit Union | $25,041.17 |
| People's Choice Credit Union | $47,604.27 |
| Navigant Credit Union | $47,078.07 |
| Ally Financial | $25,041.17 |
| BFS Capital | $22,697.00 |
| Rhode Island Credit Union | $48,188.00 |
| Navy Federal Credit Union | $49,500.00 |
| Land Rover Richmond | $64,453.00 |
| Amazon | $50,000.00 |
| | **$424,597.60** |

IV.     **<u>CONCLUSION</u>**

Based on the foregoing, the United States respectfully asks that the Court sentence the

defendant to 33-months incarceration plus 24-months on the aggravated identity theft count, a 3-

year period of supervised release, and a special assessment of $1,000.

Respectfully submitted,

UNITED STATES OF AMERICA
By its Attorney,

RICHARD B. MYRSU
Acting United States Attorney

<u>/s/ Dulce Donovan</u>
DULCE DONOVAN
Assistant U.S. Attorney
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
Email:  Dulce.Donovan@usdoj.gov

16

CERTIFICATION OF SERVICE

On this 8th day of March 2021, I caused the within United States' Sentencing Memorandum to be filed electronically and it is available for viewing and downloading from the ECF system.

/s/ Dulce Donovan
DULCE DONOVAN
Assistant U.S. Attorney
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
Email:  Dulce.Donovan@usdoj.gov